IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,  )
                           )
          Plaintiff,       )
                           )
     v.                    )  No. 14 CR 11
                           )
KRISTY SCHLEINING,         )
                           )
          Defendant.       )

MEMORANDUM OPINION AND ORDER

Kristy Schleining ("Defendant") has been charged with four counts of wire fraud for allegedly misappropriating funds that her family's trucking business, a U.S. Postal Service ("USPS") contractor, was legally required to contribute to an employee health insurance plan.

Defendant has moved to suppress evidence seized from the business and her residence in April 2009 on the grounds that USPS agents exceeded the scope of the business search warrant and failed to establish probable cause to seize healthcare records from her home. Alternatively, Defendant requests a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether the underlying warrant applications contained material misstatements or omissions that show a reckless disregard for the truth.

The Government counters that USPS had consent to conduct both searches and obtained warrants simply as a precautionary measure. In the alternative, the Government defends the manner in which USPS agents obtained and executed the warrants and opposes a *Franks* hearing.

I deny Defendant's motion to suppress and her request for a *Franks* hearing for the reasons stated below.

I.

The following facts are undisputed unless noted otherwise. In 2006, Defendant became the president of J.N. Moser Enterprises, Inc. (henceforth, "Moser"), a trucking company with offices in Aurora and Montgomery, Illinois that went out of business on February 1, 2009. Defendant's widowed mother, Dorothy Moser, owned the business. Defendant's husband, Don Schleining ("Don"), was Moser's vice president; her son, Josh Schleining ("Josh"), was Moser's transportation manager; and her daughter-in-law, Tammi Schleining ("Tammi"), was Moser's human resources manager.

Moser signed twenty-seven contracts with the USPS between 2003 and 2008 to transport mail between various locations in the Midwest. As a condition of being a USPS contractor, Moser was required to participate in USPS's fuel management program. Under this program, USPS issued "Voyager" credit cards to Moser to purchase a specified amount of fuel to perform each contract.

2

USPS retained the right to examine and audit Moser's records relating to fuel and other costs it allegedly incurred in performing each contract. Between 2005 and 2007, Defendant personally signed eleven contracts with a provision allowing USPS to examine and audit Moser's cost-related records.

In January or February 2009, around the time Moser went out of business, the USPS Office of Inspector General ("OIG") received a complaint from Robert Saxton ("Saxton"), who oversaw mail hauling contracts for the Great Lakes region. Saxton reported that his office recently terminated eight of Moser's contracts because of poor performance. According to Saxton, Moser owed USPS approximately $705,000 for fuel expenses that exceeded the contract allowances. A former Moser employee also reported to Saxton that the company had used Voyager cards for fuel expenses unrelated to the USPS contracts.

Based on Saxton's complaint, OIG started investigating Moser's use of the Voyager cards. In connection with this investigation, OIG interviewed the following witnesses on March 25, 2009:

> (1) Susan Alsip ("Alsip"), a former Moser dispatcher who said that the company used Voyager cards for non-USPS contracts and for personal vehicles based on the assumption that Moser could simply reimburse USPS for any amounts exceeding the contract allowances. See Def.'s Ex. I.

3

(2) Samantha Pilgrim ("Pilgrim"), Alsip's sister and a former Moser employee who was responsible for making sure that the company's fuel purchases matched the contractual allowances. *See* Def.'s Ex. G. Pilgrim added that every Moser vehicle, including trucks used for non-USPS contracts and personal vehicles, had a Voyager card. *Id.* at 2.

(3) James Bailey ("Bailey"), a former Moser driver who stated that his dispatcher, Gary "Skip" Block, instructed him to use a Voyager card while performing a non-USPS contract. *See* Def.'s Ex. H. Bailey also said that every vehicle in Moser's fleet had a Voyager card assigned to it. *Id.* at 2.

(4) Edwin Cardona ("Cardona"), a former Moser driver who provided little information about the company's use of Voyager cards, but complained that Moser had removed money from the employee health insurance fund. *See* Def.'s Ex. J at 2.

OIG also interviewed a USPS contracting specialist on April 2, 2009, who confirmed that Moser had signed a cost statement showing the fuel allowance for each of its USPS contracts.

On the basis of these interviews, OIG Special Agent Kimberly Fazekas ("SA Fazekas") applied for a warrant to search Moser's office at 433 South Lake Street in Aurora, Illinois and seize evidence relating to possible theft of government funds. *See* Def.'s Ex. C ("Business Warrant"). In support of the warrant application, SA Fazekas submitted an affidavit in which she estimated that Moser exceeded its contractual allowance for diesel fuel purchases by over $800,000 from 2007 to 2009 and purchased almost $200,000 of unleaded fuel for personal vehicles during the same period. *Id.* at ¶ 16(d). SA Fazekas also

4

summarized OIG's interviews with former Moser employees, but did not mention Cardona's allegation that Moser had removed money from the employee health insurance fund.  *Id.* at ¶¶ 17-20.  The items to be seized during OIG's proposed search of the Aurora office included records relating to Moser's mail hauling contracts; fuel purchases; vehicles fleet; personnel records; internal decision-making structure; legal incorporation; and any audits or inspections conducted by the Department of Transportation.  *Id*. at Attachment B.  Judge Mason signed the Business Warrant on April 3, 2009 at 1:30 PM.

OIG, with assistance from the Aurora Police Department, executed the Business Warrant around 4:00 PM on the day it was issued.  Meanwhile, SA Fazekas and Special Agent Michele Goldsmith ("SA Goldsmith") questioned the Schleinings--Kristy, Don, Josh, and Tammi--about the company's use of Voyager cards and other topics, including whether Moser had removed money from its employee health insurance plan.  As a government contractor, Moser was legally required to establish such a plan or make equivalent cash payments to its employees.  41 U.S.C. at § 6703(2).  Moser chose the first option and contracted with FCE Benefit Administrators, Inc. ("FCE") in April 2005 to establish the Moser Health and Welfare Plan ("Plan").  While executing the Business Warrant, OIG seized Plan documents, correspondence between Moser and FCE, and a summary of employee earnings from

5

July 2008 to February 2009.  Defendant seeks to suppress these documents, twenty-two in total, on the ground that the Business Warrant did not authorize OIG agents to seize them.  *See* Def.'s Ex. E.

After the April 3 search, OIG noticed the absence of payroll records among the documents it had seized from the Aurora office.  Accordingly, on April 16, 2009, SA Fazekas applied for a warrant to search Defendant's residence in Montgomery, Illinois and seize documents relating to Moser's use of Voyager cards and fuel consumption; the USPS mail hauling contracts; personnel files, payroll records, and benefits information; and the company's vehicle fleet.  *See* Def.'s Ex. D ("Residence Warrant").  In an affidavit supporting the Residence Warrant application, SA Fazekas represented that if such documents had been found at the Aurora office, OIG agents would have seized them while executing the Business Warrant.  *Id*. at ¶ 24.  SA Fazekas, however, did not attach the Business Warrant, which in reality did not expressly authorize the seizure of employee benefits information.

With regard to the targeting of Defendant's residence, SA Fazekas stated that two former Moser employees who were interviewed after April 3 disclosed that Defendant did the company's payroll out of her home office.  *Id*. at ¶¶ 27-28.  One these employees ("Driver C") and a third former Moser employee

("Dispatcher A") stated that they faxed business related documents to Defendant and her husband at their home telephone number. *Id*. at ¶¶ 27, 29. Judge Brown signed the Residence Warrant on April 16, 2009 at 2:50 pm.

OIG executed the Residence Warrant on April 17, 2009. Defendant seeks to suppress two documents seized during this search: (1) handwritten notes regarding Moser's payments to FCE and (2) a February 2006 fax from FCE regarding Moser's late submission of its Plan contributions. *See* Def.'s Ex. F. Defendant has identified thirty-eight other documents that she characterizes as "fruits of the poisonous tree" that should also be suppressed. *See* Def.'s Ex. R.

II.

I start with the Government's argument that the USPS contracts allowed OIG agents to search and seize records from the Aurora office and Defendant's home office without obtaining a warrant.[1]

"It is...well settled that one of the specifically established exceptions to the requirements of both a warrant and

---

[1] To be clear, the Government is not arguing that mailing hauling is a "closely regulated" industry where "warrantless inspection[s] of commercial premises may well be reasonable within the meaning of the Fourth Amendment." *New York v. Burger*, 482 U.S. 691, 702 (1987); *see also U.S. v. Biswell*, 406 U.S. 311 (1972); *Colonnade Catering Corp. v. U.S.*, 397 U.S. 72(1970).

probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. "[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Id.* at 249.

The consent provision in one of the last contracts that Moser signed with USPS in April 2008 states:

> (2) *Examination of Costs.* If this is a cost-type contract, the supplier must maintain, and the Postal Service will have the right to examine and audit all records and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly in the performance of the contract. This right of examination includes inspection at all reasonable times of the supplier's plant, or parts of them, engaged in the performance of this contract.
>
> [...]
>
> (5) *Availability*. The supplier must maintain and make available at its office at all reasonable times the records, materials, and other evidence

>     described in paragraphs (a) through (d) of this
>     clause, for examination, audit, or reproduction,
>     until three years after final payment under this
>     contract or any longer period required by statute
>     or other clauses in this contract.  In addition:
>
>     (a) If this contract is completely or
>         partially terminated, the supplier must
>         make available the records related to
>         the work terminated until three years
>         after any resulting final termination
>         settlement; and
>
>     (b) The supplier must make available
>         records relating to appeals under the
>         claims and dispute clauses or to
>         litigation or the settlement of claims
>         arising under or related to this
>         contract.  Such records must be made
>         available until such appeals,
>         litigation or claims are finally
>         resolved.

Dkt. No. 54-1 at 6-7 ("Consent Provision").

One of the costs that Moser was required to estimate when bidding on USPS contracts was the cost of providing statutorily-required health insurance benefits.  *See* Dkt. No. 54-2 ("Highway Transportation Contract – Cost Worksheet").  In its second to last USPS contract, Moser estimated that the cost of providing health insurance to its employees would be approximately $125,000.  *Id*.

Defendant has not presented any evidence that Moser's decision to contract with USPS on the condition that OIG agents could examine and audit the company's cost-related records was less than voluntary.  Instead, Defendant contends that her

9

husband was primarily responsible for signing USPS contracts; that she signed the contracts only when her husband was absent; that she does not recall reading the Consent Provision; and that she never thought Moser had waived its Fourth Amendment rights. Those contentions are legally irrelevant to whether Moser voluntarily entered into twenty-seven contracts with USPS between 2003 and 2008 that contained a Consent Provision or similar language.

The Supreme Court recognized long ago that businesses sometimes bargain away their Fourth Amendment rights in order to obtain government contracts: "[W]hen petitioner, in order to obtain the government's business, specifically agreed to permit inspection of his accounts and records, he voluntarily waived such claim to privacy which he otherwise might have had as respects business documents related to those contracts." *Zap v. U.S.*, 328 U.S. 624, 628 (1946), *vacated on other grounds*, 330 U.S. 800 (1947). Since *Zap*, appellate courts have uniformly rejected Fourth Amendment claims by government contractors who

agreed to inspection, audit, or examination provisions.[2]  The
only wrinkle in these cases that might help Defendant is the
Fifth Circuit's holding in *Harris Methodist* that the government
contractor in that case had only consented to "searches that
comport with constitutional standards of reasonableness."  970
F.2d at 100.  In other words, the consent provision at issue in
*Harris Methodist* implicitly preserved some of the government
contractor's Fourth Amendment rights.

The Seventh Circuit has taken a different approach to
construing contracts in which a private party consents to
government searches.  In *U.S. v. Barnett*, 415 F.3d 690 (7th Cir.
2005), the Seventh Circuit held that a defendant who consents to
searches of his person or property as a condition of probation

---

[2] *See U.S. v. Harris Methodist Forth Worth*, 970 F.2d 94, 100
(11th Cir. 1992) (holding that private hospital had consented to
reasonable searches of its records in exchange for receiving
Medicare/Medicaid funding and federal construction loans); *U.S.
v. Brown*, 763 F.2d 984, 987-88 (8th Cir. 1985) (holding that
pharmacist had consented to warrantless searches in contract
that made him an authorized Medicaid provider); *U.S. v.
Jennings*, 724 F.2d 436, 448 (5th Cir. 1984) (holding that
organization serving meals to children under federal program had
"voluntarily waived any claims to privacy that it might have had
with respect to documents relating to this contract"); *First
Alabama Bank v. Donovan*, 692 F.2d 714, 719-20 (11th Cir. 1982)
(holding that bank had consented to reasonable searches of its
records in exchange for becoming a depository for federal funds
and an issuer/redeemer of federal savings bonds); *U.S. v.
Griffin*, 555 F.2d 1323, 1325 (5th Cir. 1977) (holding that
pharmacist "knowingly and voluntarily agreed by contract to
maintain records of the prescriptions which he billed to the
state and to make these records available for inspection at any
time").

has contracted away *all* of his Fourth Amendment rights and may no longer insist on a showing of probable cause or reasonable suspicion. As *Barnett* explains, "Nothing is more common than an individual's consenting to a search that would otherwise violate the Fourth Amendment, thinking that he will be better off than he would be standing on his rights. Often a big part of the value of a right is what one can get in exchange for giving it up." *Id*. at 692. The Seventh Circuit's observation applies with equal force to criminal defendants, as in *Barnett*, who must choose between prison time or warrantless searches while on probation; public university students, as in *Medlock v. Trustees of Indiana Univ.*, 738 F.3d 867, 872 (7th Cir. 2013), who must choose between living off campus or living in a dorm room that can be searched for contraband on twenty-four hours' notice; or, as here, a business facing a choice between maintaining the privacy of its records or relinquishing Fourth Amendment rights in exchange for a lucrative government contract. In other words, there is a direct line between *Barnett*, *Medlock*, and the present case that supports holding Moser to the terms of a contract in which it voluntarily relinquished Fourth Amendment rights in exchange for a valuable business opportunity.

The only contractual limitation on USPS's right to examine and audit Moser's records is that the right "includes inspection at all reasonable times of the supplier's plant, or parts of

them, engaged in the performance of this contract." Dkt. No. 54-1 at 6. There is no evidence in the record that either of OIG's searches occurred at an unreasonable time. As for Defendant's contention that the Consent Provision does not cover OIG's search of her home on April 17, 2009, I decline to adopt a reading of the contract that would allow Moser to turn the Consent Provision into a nullity by simply moving business records from the Aurora office to Defendant's home office.

In sum, I hold that Moser voluntarily consented to the searches and seizures that took place on April 3 and 17, thereby placing OIG's actions outside the scope of the Fourth Amendment. It follows that I need not address Defendant's arguments that OIG agents exceeded the scope of the Business Warrant; failed to establish probable cause to seize Plan documents from her residence; and submitted warrant applications that contained material misstatements and omissions that showed a reckless disregard for the truth such that she is entitled to a *Franks* hearing.

## III.

Defendant's motion to suppress or for a *Franks* hearing is DENIED for the reasons stated above.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: April 6, 2015